**2024 IL 129599**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 129599)

ANDREW W. LEVENFELD AND ASSOCIATES, LTD., *et al.*, Appellants, v. MAUREEN V. O'BRIEN *et al.*, Appellees.

*Opinion filed September 19, 2024.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Holder White, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

## OPINION

¶ 1      Plaintiffs, Andrew W. Levenfeld and Associates, Ltd., and Stephen J. Schlegel, Ltd., appeal the decision of the appellate court that reversed, in part, the *quantum meruit* award the Cook County circuit court entered in their favor, which was based on legal services they provided to defendants, Maureen V. O'Brien and Daniel P. O'Brien III (Maureen and Daniel III, respectively). See 2023 IL App (1st) 211638.

The appellate court remanded the case to the circuit court with directions that it enter a new determination of the reasonable value of those services. *Id.* ¶ 56. Defendants cross-appeal, claiming the courts below erred in determining that plaintiffs proved the essential elements of a *quantum meruit* claim and, alternatively, that plaintiffs failed to present sufficient evidence of the reasonable value of their services, thus precluding any such award.

¶ 2        To resolve this appeal, we first determine whether the courts below erred in finding plaintiffs proved the requisite elements for *quantum meruit* recovery. If we find no error in its determination that plaintiffs are entitled to a *quantum meruit* recovery, we must decide whether the circuit court erred in determining the reasonable value of plaintiffs' legal services. Specifically, we must review the circuit court's consideration of the contingency fee structure set forth in the attorney-client agreement, which was executed by all parties but terminated by defendants, as evidence of the value of plaintiffs' services. Defendants argue, and the appellate court found, that consideration of the contingency fee structure agreed upon by the parties was improper on the basis that the attorney-client agreement provided for plaintiffs' joint representation of defendants and defendants failed to enter into a contemporaneous fee-splitting agreement conforming with Rule 1.5(e) of the Illinois Rules of Professional Conduct of 2010.[1] Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010). If we determine, as the appellate court did, that the circuit court so erred, we must determine whether plaintiffs presented sufficient other evidence of the reasonable value of its services to allow for a remand to the circuit court for a redetermination of the amount of the judgment.

¶ 3        For the reasons that follow, we agree with the courts below that plaintiffs presented sufficient evidence to sustain their *quantum meruit* claim. However, we find the appellate court erred in reversing the circuit court's judgment as to the reasonable value of plaintiffs' services because, based on the circumstances presented, the circuit court did not commit reversible error in using the contingency fee structure set forth in the attorney-client agreement as evidence of value.

---

[1] In the courts below, defendants argued that plaintiffs were barred from any recovery in *quantum meruit* because of their violation of Rule 1.5(e). Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010). 2023 IL App (1st) 211638, ¶ 3. However, defendants have not advanced that argument before this court and, thus, have forfeited same. See *People v. Griffin*, 2024 IL 128587, ¶ 54 (citing Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)).

Accordingly, we need not determine whether other evidence presented at the bench trial was sufficient to determine that value. Thus, we affirm in part and reverse in part the appellate court's judgment and affirm the judgment of the circuit court.

¶ 4                                    BACKGROUND

¶ 5                             A. The Operative Complaint

¶ 6        While the litigation that is the subject of this appeal commenced in 2017, the operative complaint at the time the circuit court entered its judgment was the "Second Amended Verified Complaint," which was filed December 9, 2020. A summary of the essential allegations contained in the complaint follows.

¶ 7        Pursuant to a contract executed on October 29, 2015, defendants retained the legal services of plaintiffs and their respective firms regarding various assets pertaining to the estate of Daniel P. O'Brien Sr. and Mary D. O'Brien (O'Brien Estates), both deceased. The attorney-client agreement, which plaintiffs attached to the complaint, provides *inter alia* that "the total fees to be charged shall be either 15% of the first $10,000,000 and 10% of any additional values of the assets recovered for the clients, or the amount of charges made for time expended, whichever is greater." In addition, the attorney-client agreement provides, *inter alia*, that "[a]ny party hereto may terminate this agreement upon reasonable advance notice."

¶ 8        Over the course of one year and seven months, plaintiffs represented defendants pursuant to the attorney-client agreement, in connection with numerous cases pending in the circuit court of Cook County, the Appellate Court, Fourth District, federal court, and in circuit courts located in the State of Michigan. The goal of the litigation was to secure a liquidation of plaintiffs' interests in assets held by the O'Brien Estates and related entities. In so doing, plaintiffs spent in excess of 3100 hours of attorney and paralegal time culminating in settlement negotiations with the executors and/or trustees, with the gap between demands and settlement offers closing substantially just prior to May 25, 2017.

¶ 9        On May 25, 2017, without cause, defendants terminated the attorney-client agreement by e-mailing a termination letter to plaintiffs. Soon thereafter,

defendants entered into a settlement agreement with the O'Brien Estates by virtue of which defendants received substantial sums of money far in excess of the fees and costs claimed by plaintiffs and not significantly greater than that offered during plaintiffs' representation of defendants. Plaintiffs attached certified billing records documenting their representation of defendants, showing a combined total of 3000 hours. Both plaintiffs, along with their respective staff, expended a considerable portion of the total hours expended.

¶ 10 As their claims for relief, plaintiffs sought an adjudication of their fees and costs "upon equitable principles," claiming that an equitable adjudication would include the imposition of fees based on the percentages as provided in the attorney-client agreement. Specifically, plaintiffs asserted that the contingency structure set forth in the attorney-client agreement would constitute a reasonable fee in *quantum meruit* for services they rendered before their termination. Plaintiffs alleged that defendants accepted and benefited from their services and have not paid plaintiffs. Plaintiffs alleged the services they provided to defendants were "worth not less than $2,437,500 plus costs advanced of $7,390.60" and sought this amount in *quantum meruit*, along with the advanced costs and a corresponding equitable lien against the settlement fund.

¶ 11 B. The Attorney-Client Agreement

¶ 12 We set forth with particularity the terms of the attorney-client agreement as attached to the operative complaint. It is made between "ANDREW W. LEVENFELD & ASSOCIATES, LTD., STEPHEN J. SCHLEGEL, LTD. ('Attorneys'), and MAUREEN V. O'BRIEN and DANIEL P. O'BRIEN III ('Clients')" on October 29, 2015. Therein, "Attorneys" agree to represent "Clients" in their claims to enforce their rights to assets held by the O'Brien Estates and related entities, to which they both owned interests. "Clients" agree to retain and employ "Attorneys" to represent them and protect and enforce any rights they have or that may arise in the future, in connection with their relationship with the O'Brien Estates and related entities.

¶ 13 The attorney-client agreement states that "Clients" do not have a current retainer deposit with "Attorneys," who reserve the right to request one in the future should they believe it necessary for any reason. It specifies that it is understood and

agreed that the matters being undertaken are expected to involve a substantial amount of professional time, services, and risk, and that "Clients" currently do not have liquid cash assets to provide for the bills for anticipated legal services and costs.

¶ 14 "Clients" agree to pay "minimum" attorney fees at an hourly rate of $300 per hour for time spent by Andrew W. Levenfeld and/or Stephen J. Schlegel, $250 per hour for associate attorney time, and $85 per hour for paralegal or paraprofessional time. In addition, "Clients" are responsible to reimburse "Attorneys" all reasonable and necessary costs and expenses incurred in the performance of the legal services. The minimum fee to be charged in any event for time spent prior to the execution of the attorney-client agreement and thereafter shall be the sum of $30,000.

¶ 15 The "total" fees to be charged shall be either 15% of the first $10 million and 10% of any additional values of the assets recovered for "Clients" or the amount of charges made for time expended, whichever is greater. "[A]ssets recovered" is defined as "the fair market value of any property *** transferred from the [O'Brien Estates] or businesses in which Clients currently own percentage interests, to the ownership of the Clients or either of them."

¶ 16 Any party thereto may terminate the attorney-client agreement upon "reasonable advance notice." However, termination of the attorney-client agreement "will not dispel [Clients'] obligation to pay for all work done prior to the end of the attorney-client relationship."

¶ 17 C. Defendants' Affirmative Defense

¶ 18 Defendants filed an answer and affirmative defenses to the complaint, averring, *inter alia*, that plaintiffs violated Rule 1.5(e) of the Rules of Professional Conduct (Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010)) in that they never entered into a proper agreement to divide the fee they earned from defendants and thus did not disclose to defendants in writing how they planned to split the attorney fee. According to this affirmative defense, plaintiffs are barred from any recovery whatsoever due to this failure to comply with Rule 1.5(e). *Id.*

¶ 19        In their reply to defendants' affirmative defenses, plaintiffs acknowledged Rule 1.5(e) and admitted that they did not, during the course of their representation of defendants, disclose to defendants how they planned to split attorney fees. However, they denied that Rule 1.5(e) is applicable in a claim in *quantum meruit* and denied that a violation of Rule 1.5(e) warrants a nondisciplinary remedy such as barring recovery for the reasonable value of legal services they provided to defendants.

¶ 20                        D. Bench Trial and Circuit Court Judgment

¶ 21        In May 2021, the circuit court held a bench trial over the course of several days. The evidence introduced at trial included expert testimony concerning the reasonable value of plaintiffs' services to defendants. Plaintiffs' expert testified that he has been in practice since 1989, specializing in contested trusts and estates. His articles and lectures are widely published, and he has been the general editor of the Illinois Institute for Continuing Legal Education book "Litigating Disputed Estates, Trusts, Guardianships, and Charitable Bequests" and authored many of its chapters. After the circuit court found him qualified to render an opinion as to the value of the legal services plaintiffs provided to defendants, plaintiffs' expert testified to the following.

¶ 22                        1. Plaintiffs' Expert's Opinion on Value of
                            Legal Services Provided

¶ 23        Plaintiffs' expert explained, as a basis for his valuation opinion, that defendants' pursuit of liquidation of their interests in the O'Brien Estates and related assets was complex, with some 80 properties spread over three states and a number of LLPs and LLCs involving a very litigious family. Defendants had little to no leverage over the estates, trusts, or properties involved and had no funds to hire a lawyer. Both plaintiffs were highly qualified and spent around 3000 hours over 19 months, achieving a very good result for defendants, who discharged them for no reason. The offers plaintiffs generated and the counteroffer they suggested looked almost identical to what defendants settled for less than 60 days after discharging plaintiffs. For these reasons, the expert opined that a reasonable fee in this matter could be found by reference to the contingency fee structure set forth in the attorney-client

agreement. The expert acknowledged that the attorney-client agreement had been terminated and thus was unenforceable, but he stated that the reasonable value of the services rendered under these circumstances is 15% of the first $10 million and 10% of the remaining amount of recovery.

¶ 24　　Plaintiffs' expert testified that he found the contingency fee structure was reasonable in its percentage and that, using the percentages set forth therein, a reasonable award in *quantum meruit* would be $2,132,390.60. This amount represents 15% of the first $10 million and 10% of the remaining $6.25 million, all based on the May 1, 2017, offer that was generated by plaintiffs, plus $7390.60 in costs and expenses.

¶ 25　　　　　　　　　2. Defendants' Expert Opinion on Value of
　　　　　　　　　　　　Legal Services Provided

¶ 26　　Defendants' expert had been a practicing attorney for 18 years and had been practicing in estate planning and estate and trust administration and litigation. After the circuit court found him qualified to render an opinion on how such litigation is handled, he testified that plaintiffs are not entitled to any recovery of fees under *quantum meruit* because they mishandled defendants' case. He testified that, because defendants' interests in the O'Brien Estates and related assets were "uncontested," a reasonable Illinois estate and trusts attorney would not have elected to utilize a contingency fee structure and entering into such a fee agreement was improper.

¶ 27　　Defendants' expert further testified that plaintiffs mishandled the case because Maureen should have been advised to seek independent counsel due to potential conflicts of interest caused by her dual roles as coexecutor and beneficiary of the O'Brien Estates. He criticized plaintiffs' litigation strategy, particularly for failing to develop a coherent strategy for valuing the assets prior to engaging in settlement negotiations and for advising Maureen to resign as coexecutor of the O'Brien Estates.

¶ 28　　After hearing all the testimony and taking the case under advisement, the circuit court entered a 15-page judgment in which it outlined its findings of fact and

conclusions of law, as follows.

¶ 29                    3. Circuit Court's Findings of Fact and
                               Conclusions of Law

¶ 30        In July 2015, defendants approached plaintiff Schlegel, who specializes in civil litigation, seeking legal counsel to monetize their interests in the O'Brien Estates and related entities. At that meeting, defendant Maureen provided Schlegel with a large bag of documents and later provided him with additional documents. During this time, Schlegel reviewed thousands of documents provided by Maureen and examined court files in order to understand the relationships of the parties and the disputes. Due to the complexity of the issues, Schlegel told defendants he would not accept the case unless plaintiff Levenfeld, an estates and trusts attorney, would agree to work on the matter with him, to which defendants agreed.

¶ 31        Prior to plaintiffs accepting the assignment, plaintiffs understood the total net value of the assets of the O'Brien Estates and related entities to be between $40 million and $80 million. The assets were valued at $52 million for tax purposes. This valuation was performed by defendant Maureen, who is a real estate broker. At the time they sought plaintiffs' representation, defendants did not have the ability to pay ongoing legal fees and had substantial debt. On October 29, 2015, plaintiffs and defendants entered into the attorney-client agreement.

¶ 32        During their time representing defendants, both plaintiffs were responsible for handling defendants' legal matters over multiple pieces of litigation, including actions in the circuit court of Cook County, in the United States District Court for the Northern District of Illinois, in the Illinois Appellate Court, First District, and in Barrien County, Michigan. Plaintiffs represented defendants in their capacity as plaintiffs and also as defendants in what had been characterized as retaliatory litigation, which was initiated by the coexecutor of the O'Brien Estates. Plaintiffs developed and implemented a strategy that included having defendant Maureen resign as coexecutor, actions to remove the remaining executors, petitions to convert the O'Brien Estates from independent administration to supervised administration, actions seeking to partition the O'Brien Estates' assets for distribution, and a petition to recover assets against the son of an executor, who allegedly received assets belonging to the O'Brien Estates without entitlement.

¶ 33    Plaintiffs were successful in having defendant Maureen resign as coexecutor and in terminating the administration of the O'Brien Estates, thereby turning them into supervised administrations. The circuit court of Cook County denied plaintiffs' petition to remove the executors of the O'Brien Estates, which was affirmed on appeal. Significant motion practice and exchange of discovery ensued in the partition actions, and ultimately, some or all of the claims were dismissed. The petition to recover assets from the executor's son was still pending when defendants terminated plaintiffs' representation.

¶ 34    At the time of plaintiffs' engagement, defendants had never received a settlement offer from the O'Brien Estates and related entities. Shortly after the engagement, defendant Daniel III received two offers of between $5 and $6 million, which he rejected. Daniel III testified that, at an unspecified time, plaintiffs made a demand of $40 million on behalf of defendants. In September 2016, defendants received an offer totaling $13.3 million, which they rejected. On April 5, 2017, plaintiffs issued a demand on behalf of defendants for $18.3 million. The O'Brien Estates responded on April 11, 2017, with a "final" counteroffer of $15.44 million and requested a response by the close of business on April 14, 2017. Defendants did not accept the offer, but on April 17, 2017, plaintiffs sent a demand on behalf of defendants totaling $17,106,662 that included a provision allowing defendant Maureen to purchase the home in which she resided, for which the title was held by one of the trusts established by the O'Brien Estates.

¶ 35    On May 1, 2017, the O'Brien Estates responded with an offer totaling $16.25 million, with no provision that Maureen could keep the home. On May 8, 2017, plaintiffs provided defendants with their recommended demand totaling $16.75 million. However, defendants did not authorize plaintiffs to issue the proposed demand, and when they did not receive a response to their May 1, 2018, offer by May 10, 2018, the O'Brien Estates withdrew all offers. On May 25, 2018, in an e-mail from defendants' new attorneys, defendants advised plaintiffs that their representation was terminated. On July 21, 2017, defendants accepted $16.85 million in settlement from the O'Brien Estates. Defendants agreed to pay their new attorneys a flat fee of $500,000 to settle the case.

¶ 36 The circuit court found that plaintiffs had proven all the elements of a *quantum meruit* claim, which are summarized as follows.[2] Although the attorney-client agreement was not effective after it was terminated by defendants, its very existence proves that plaintiffs intended to perform legal services nongratuitously. Defendants accepted those services and authorized plaintiffs to act on their behalf in multiple pieces of litigation and during settlement negotiations with attorneys for the O'Brien Estates.

¶ 37 The circuit court concluded that plaintiffs proved they conferred a benefit on defendants in their rendition of legal services on defendants' behalf based on the amount and quality of the work performed, as set forth above. While certain of plaintiffs' litigation tactics failed, when defendants retained plaintiffs, they were receiving no benefit whatsoever from their combined 50% interest in the O'Brien Estates' assets. Over the next 19 months, plaintiffs obtained progressively larger settlement offers, and 3 weeks before they were terminated, on May 1, 2017, the O'Brien Estates offered to settle for $16.85 million.

¶ 38 The circuit court found defendants' argument that plaintiffs had harmed defendants by not retaining a professional to perform a valuation of the assets was purely speculative, as they had presented no evidence to show that the settlement was significantly below the fair market value of their interests. Because defendants ultimately accepted a settlement less than two months after plaintiffs were terminated, the circuit court found the settlement was based in significant part on the pressure plaintiffs brought to bear on the O'Brien Estates through their litigation efforts. Thus, the circuit court concluded that plaintiffs were entitled to recovery in *quantum meruit*.

¶ 39 The circuit court next addressed defendants' first affirmative defense, which asserted that plaintiffs' violation of Rule 1.5(e) of the Rules of Professional Conduct (Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010)) requires that plaintiffs are barred from recovery in *quantum meruit*. The court noted that it previously rejected this argument when it denied defendants' motion for summary

---

[2]A party seeking recovery on a *quantum meruit* theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation. *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 365 (1997).

judgment on December 9, 2019, finding that a technical violation of an Illinois Rule of Professional Conduct did not bar recovery as a matter of law. Rather, the circuit court had ruled it would consider the egregiousness of the violation and any resulting prejudice to defendants or the administration of justice in determining whether the violation would bar *quantum meruit* recovery under the circumstances.

¶ 40   The circuit court found that, despite the foregoing, defendants failed to present any evidence at trial tending to show that the violation was egregious or prejudicial to them or the administration of justice. Plaintiffs, on the other hand, elicited testimony from defendants showing that they understood they were being represented by lawyers at two different firms and both lawyers would be responsible for handling their legal matters. They understood that Schlegel would not accept their case unless Levenfeld agreed to jointly represent them. Each defendant communicated with each plaintiff regarding the matters undertaken by plaintiffs. The circuit court found it important that both defendants testified they understood both attorneys would be compensated and that it did not particularly matter to them how the fees were being shared.

¶ 41   Moreover, although the attorney-client agreement was terminated by defendants, it was admitted into evidence at trial and demonstrated the relationship between the parties. Specifically, it was signed by both defendants and clearly identifies that both plaintiffs would render legal services to both defendants and that plaintiffs would be jointly and severally compensated by defendants. Accordingly, the circuit court found defendants failed to meet their burden to demonstrate that plaintiffs' violation of Rule 1.5(e) was sufficiently egregious or prejudicial to the administration of justice and thus precluded *quantum meruit* recovery.

¶ 42   After the circuit court disposed of the remainder of defendants' affirmative defenses, which are not relevant to this appeal, it turned to the task of determining the reasonable value of plaintiffs' services. In so doing, it began with an analysis of the factors relevant to an attorney fee award in *quantum meruit* as applied to the evidence presented at trial.[3] The circuit court found plaintiffs are highly qualified

---

[3]In awarding legal fees on the basis of *quantum meruit*, courts consider (1) the attorney's skill and standing, (2) the time and labor required, (3) the nature of the cause and the difficulty of the

and skilled attorneys who have each been in practice and in good standing with the Illinois bar for more than 40 years. Schlegel's practice focuses on litigation, while Levenfeld's practice focuses on estate and financial planning. It noted that plaintiffs' time records reflect plaintiffs, as well as their staff and a volunteer helper, spent in excess of 3000 hours working on defendants' behalf over approximately 19 months. The matters involved were complex and required expertise in federal and state court litigation as well as estate and trust expertise, which is why Schlegel required defendants to agree to Levenfeld's joint representation prior to entering into the attorney-client relationship.

¶ 43    Plaintiffs were responsible for all the underlying legal matters until the date of their termination, although they aptly hired local counsel to represent defendants in Michigan. Schlegel testified that his usual and customary rate for complex litigation matters at that time was $450 to $600 per hour, and he charged $250 per hour for associates and $85 per hour for paralegals and paraprofessionals. Levenfeld did not testify as to his normal hourly rate. Again, the circuit court determined that, as a direct result of plaintiffs' work, defendants received all, or nearly all, the leverage needed to consummate a $16.85 million settlement.

¶ 44    In calculating the amount of the fee, the circuit court noted that, although the attorney-client agreement was unenforceable due to defendants' termination notice, and despite the violation of Rule 1.5(e), the contingency fee structure contained therein could serve as a basis for calculating the amount of the award. The circuit court reasoned that the contingency fee term in the attorney-client agreement constitutes evidence of the parties' own views as to what was fair and reasonable. In addition, the circuit court gave the contingency fee term weight because it was accurately based on the circumstances of the representation. Specifically, plaintiffs incurred a great deal of risk by not charging defendants, who received the benefit of legal representation without the obligation to pay legal fees until the representation was concluded. The circuit court recognized defendants' argument that the amount should be zero because plaintiffs actually harmed defendants during

issues involved, including the amount of money at issue, (4) the novelty and difficulty of the subject matter, (5) the attorney's degree of responsibility in managing the case, (6) the usual and customary charge for that type of work in the community, and (7) the benefits resulting to the client. *In re Estate of Callahan*, 144 Ill. 2d 32, 44 (1991).

their representation but rejected it outright based on its analysis of the benefit conferred upon defendants as outlined above.

¶ 45    Noting that defendants did not set forth an alternative method of calculating fees under a *quantum meruit* theory, the circuit court agreed with plaintiffs' calculation. The circuit court found the settlement was reached shortly after plaintiffs' representation of defendants terminated and could be substantially attributed to plaintiffs' efforts. Thus, citing cases from the First, Second, and Third Districts, the circuit court concluded that a calculation of fees based on the contingency term of the attorney-client agreement would result in the reasonable value of their services and thus an appropriate *quantum meruit* award. See *Will v. Northwestern University*, 378 Ill. App. 3d 280 (1st Dist. 2007); *Wegner v. Arnold*, 305 Ill. App. 3d 689 (2d Dist. 1999); *In re Estate of Kelso*, 2018 IL App (3d) 170161.

¶ 46    Based on the contingency fee in the attorney-client agreement, as applied to the amount of defendants' settlement, the circuit court found that the reasonable value of plaintiffs' legal services to defendants is $2,185,000, which is 15% of $10 million plus 10% of $6.85 million. The circuit court then deducted the amount of $500,000, which was the flat fee paid to the subsequent attorneys for the work they performed. The circuit court then added the amount of $7390.60, which the parties stipulated plaintiffs had incurred in expenses during the representation, resulting in a judgment in favor of plaintiffs in the amount of $1,692,390.60.[4]

¶ 47                                E. Appellate Proceedings

¶ 48    The appellate court reversed the circuit court's determination that the amount of the contingency fee was a reasonable fee for plaintiffs' services but affirmed the circuit court's finding that plaintiffs are entitled to recover from defendants in *quantum meruit.* 2023 IL App (1st) 211638, ¶ 4. After setting forth the evidence presented at the bench trial in detail, the appellate court found that, as a matter of law, the attorney-client agreement was unenforceable due to the plaintiffs' violation of Rule 1.5(e) (Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010)) but that

---

[4]The circuit court did not enter an attorney's lien but only a money judgment.

the violation, under the circumstances presented, did not preclude recovery under a theory of *quantum meruit*. 2023 IL App (1st) 211638, ¶ 38.

¶ 49    In examining the circuit court's determination of the amount of the award, the appellate court found that the circuit court erroneously based its calculation of the reasonable value of plaintiffs' services on the contingency structure set forth in the attorney-client agreement. Citing a case from the First District as well as a California case, the appellate court found that the attorney-client agreement is void as against public policy due to the Rule 1.5(e) violation. *Id. ¶¶* 40-45 (citing *Donald W. Fohrman & Associates, Ltd. v. Marc D. Alberts, P.C.*, 2014 IL App (1st) 123351, and *Chambers v. Kay*, 56 P.3d 645 (Cal. 2002)). The appellate court found that using the contingency fee structure in a void contract would allow plaintiffs to skirt the requirements of Rule 1.5(e), while indirectly enforcing an unlawful fee agreement, leading to an unjust and absurd result and rendering the rule superfluous. *Id. ¶* 44.

¶ 50    The appellate court subsequently addressed defendants' arguments that the evidence was insufficient to prove the benefit element of *quantum meruit*. *Id. ¶¶* 47-51. Outlining the evidence of plaintiffs' litigation strategy, the evolution of settlement negotiations, and the timing of the settlement following plaintiffs' termination, the appellate court upheld this part of the circuit court's judgment, thus remanding to the circuit court for a redetermination of the amount of the award. *Id. ¶¶* 51-52. We allowed plaintiffs' petition for leave to appeal, and defendants subsequently cross-appealed. See Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 51                                    ANALYSIS

¶ 52                    A. *Quantum Meruit* Recovery for Legal Services

¶ 53    To resolve both the appeal and the cross-appeal, we must first determine whether the courts below erred when they determined that plaintiffs are entitled to recover the reasonable value of their legal services to defendant in *quantum meruit*. According to the attorney-client agreement, any party could terminate the representation upon reasonable advance notice, but this does not discharge the client's agreement to pay for services rendered. This termination clause was superfluous, however, because under Illinois law, a client may discharge his

attorney at any time, with or without cause. *Rhoades v. Norfolk & Western Ry. Co.*, 78 Ill. 2d 217, 227-28 (1979). In the event a client terminates an attorney without cause, the attorney is entitled to reasonable fees for the services rendered on the basis of *quantum meruit*. *Id.* at 230.

¶ 54                    B. Whether Plaintiffs' Services Benefited Defendants

¶ 55       Defendants argue that the circuit court erred in its determination that plaintiffs' legal services conferred a benefit on them, thus negating an essential element of their *quantum meruit* claim. See *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 365 (1997) (a party seeking recovery on a *quantum meruit* theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation). However, in holding that the termination of an attorney's services without cause creates liability in *quantum meruit* for the reasonable value of the services rendered, this court necessarily found that, in such a scenario, the elements of such *quantum meruit* are established as a matter of law. See *Rhoades*, 78 Ill. 2d at 227-28; see also *In re Estate of Callahan*, 144 Ill. 2d 32, 40 (1991) (attorney discharged without cause entitled to recover in *quantum meruit* regardless of the outcome of the litigation, even where attorney was hired pursuant to contingency agreement).

¶ 56       Assuming plaintiffs were required to specifically prove that their representation conferred a benefit on defendants, the standard of review is deferential to the circuit court's findings of fact following a bench trial, and we will not disturb them unless they are against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. " 'A finding is against the manifest weight of the evidence where "the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." ' " *People v. Chatman*, 2024 IL 129133, ¶ 34 (quoting *People v. Peterson*, 2017 IL 120331, ¶ 39, quoting *People v. Deleon*, 227 Ill. 2d 322, 332 (2008)). Here, the circuit court outlined its findings of fact with regard to the benefit plaintiffs conferred on defendants, finding that the extensive litigation plaintiffs conducted provided nearly all the leverage that consummated defendants' settlement with the O'Brien

Estates. That evidence is outlined above, and this court finds that it is sufficient to sustain the circuit court's findings.

¶ 57                                    C. Amount of Award

¶ 58                        1. Use of Contingency Fee to Calculate
                                    *Quantum Meruit* Award

¶ 59        Having found that the courts below did not err in holding that plaintiffs are entitled to recover from defendants in *quantum meruit*, we turn to the issue of whether the circuit court erred in its determination of the amount of the award. "*Quantum meruit* is an equitable remedy [citation], which allows the circuit court to use its broad discretion in arriving at what it determines to be the reasonable value of the discharged attorney's services." *Seiden Law Group, P.C. v. Segal*, 2021 IL App (1st) 200877, ¶ 29. While plaintiffs may not be required to provide a line-by-line detailing of all their efforts, they must provide some evidence that is sufficiently specific to prove the reasonable value of the benefit defendants received. *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979 (2010). If plaintiffs fail to present such evidence, the award will be deemed to be against the manifest weight of the evidence. *Id.*

¶ 60        Here, plaintiffs presented detailed time records regarding the extensive work they and their respective staff dedicated to the various lawsuits involved. In addition, they presented the attorney-client agreement, which included the contingency fee structure that had been agreed to by the parties. Importantly, plaintiffs did not present the attorney-client agreement in order to enforce the fee structure as a term of contract. Rather, they introduced it as evidence of what the parties believed would be a reasonable method of calculating the value of the services rendered in the event that defendants recovered as a result of their representation. "In cases in which an attorney who has done much work is fired immediately before settlement is reached, the factors involved in determining a reasonable fee would justify a finding that the entire contract fee is the reasonable value of services rendered." *Wegner*, 305 Ill. App. 3d at 693 (citing *Rhoades*, 78 Ill. 2d at 230). Here, plaintiffs' expert testified that the contingency structure was reasonable and that the resulting fee represented the value of the services that plaintiffs provided defendants.

¶ 61    The circuit court made specific findings as to each factor necessary to the determination of the amount of attorney fees to be awarded in *quantum meruit*. See *In re Estate of Callahan*, 144 Ill. 2d at 44 (factors to be considered are (1) the attorney's skill and standing, (2) the time and labor required, (3) the nature of the cause and the difficulty of the issues involved, including the amount of money at issue, (4) the novelty and difficulty of the subject matter, (5) the attorney's degree of responsibility in managing the case, (6) the usual and customary charge for that type of work in the community, and (7) the benefits resulting to the client). In consideration of these factors and in reliance on *Roades* and *Wegner* and the expert testimony, the circuit court determined that a reasonable attorney fee for the work plaintiffs performed is equal to the contingency fee the parties had agreed to at the outset of the representation. See *DeLapaz v. Selectbuild Construction, Inc.*, 394 Ill. App. 3d 969, 975-76 (2009) (after considering the necessary factors, the circuit court exercised appropriate discretion in awarding a discharged firm a contingent fee in *quantum meruit* where the firm performed much of the work and settlement of the case occurred shortly after discharge). Thus, based on the evidence presented, we cannot say that the opposite conclusion from that reached by the circuit court is clearly evident. See *Bernstein & Grazian, P.C.*, 402 Ill. App. 3d at 979. Yet the appellate court reversed that part of the judgment, and we must evaluate its reasoning for so doing.

¶ 62                    2. Validity of Attorney-Client Agreement *Ab Initio*

¶ 63    While the appellate court recognized the general rule that it is an appropriate use of a circuit court's discretion to award fees in *quantum meruit* as reflected by the contingency fee structure in a terminated attorney-client agreement in certain circumstances, it reversed the award on the basis that the attorney-client agreement is void *ab initio* as against public policy due to plaintiffs' failure to enter into a contemporaneous fee-splitting agreement pursuant to Rule 1.5(e). Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010). 2023 IL App (1st) 211638 ¶ 44. Because the appellate court found the attorney-client agreement was void *ab initio*, it concluded the circuit court erred in calculating the *quantum meruit* award on the basis of the contingency fee set forth therein. *Id.* ¶ 45. We consider the issue of whether a contract is void using a *de novo* standard of review. *In re Estate of Feinberg*, 235 Ill. 2d 256, 263 (2009).

¶ 64    We begin our review of the appellate court's ruling by noting the general principles applicable to a declaration that a private contract is void based on public policy. This court has explained:

> "Just as public policy demands adherence to statutory requirements, it is in the public's interest that persons not be unnecessarily restricted in their freedom to make their own contracts. The power to declare a private contract void as against public policy is therefore exercised sparingly. [Citation.] An agreement will not be invalidated on public policy grounds unless it is clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless it is manifestly injurious to the public welfare. Whether an agreement is contrary to public policy depends on the particular facts and circumstances of the case. [Citation.]" *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 130 (2005).

¶ 65    When determining whether an attorney is entitled to recover for its services in *quantum meruit*, Illinois courts recognize a distinction between an attorney-client agreement that is unenforceable because it contains an illegal term or fails to include a legally required term, on the one hand, and one that is void as against public policy because the subject of the agreement is prohibited by law, on the other. See *Much Shelist Freed Denenberg & Ament, P.C. v. Lison*, 297 Ill. App. 3d 375, 380-82 (1998) (distinguishing cases where the attorneys involved violated statutes or rules associated with attorney fees or the attorney-client relationship from those in which the attorneys were prohibited from entering into the agreement itself). In the case of the latter, where the contract itself is considered illegal, the courts will aid neither party but will leave them where they have placed themselves so that neither party can recover anything under the contract, nor in *quantum meruit*. See, *e.g.*, *Leoris v. Dicks*, 150 Ill. App. 3d 350, 353 (1986) (fee-splitting agreement violated public policy because referring lawyer was prohibited from receiving a percentage-based fee that is not based upon the sharing of services or responsibilities and thus referring attorney could not recover in law or equity from former firm under agreement); see also *Licciardi v. Collins*, 180 Ill. App. 3d 1051, 1061-63 (1989) (attorney-client agreement violated public policy because contingency fee was prohibited in domestic relations cases and thus attorney could

not recover in law or equity from client where attorney-client relationship was based on the agreement).

¶ 66    In contrast, where the attorney-client agreement itself is not illegal but some aspect of the agreement violates a rule or statute, whether *quantum meruit* recovery is barred depends on the egregiousness of the conduct involved in light of the particular facts and circumstances. See *Much Shelist Freed Denenberg & Ament, P.C.,* 297 Ill. App. 3d at 381-82 (summarizing such cases); see also *Seiden Law Group, P.C.*, 2021 IL App (1st) 200877, ¶ 27 (summarizing cases allowing *quantum meruit* recovery by attorneys even though their conduct violated ethical rules because the underlying agreements did not violate public policy and the rule violations were not sufficiently serious to bar such recovery).

¶ 67    This distinction, between a contract that is illegal versus one that is unenforceable due to some illegality in its manner of execution (see *The Carlton at the Lake, Inc. v. Barber*, 401 Ill. App. 3d 528, 535 (2010)), also impacts the standard of review. The determination of whether a contract is void *ab initio* as violative of public policy, thus precluding recovery under the contract or in *quantum meruit*, is reviewed *de novo*. *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046, ¶ 24. In contrast, if the subject of the contract itself is not void as against public policy, but plaintiffs violated a rule or statute in the manner of its formation or execution, the circuit court has broad discretion to determine whether recovery in *quantum meruit* is precluded depending on the egregiousness of the particular conduct involved. See *Much Shelist Freed Denenberg & Ament, P.C.*, 297 Ill. App. 3d at 381-82. If the reviewing court finds that recovery in *quantum meruit* is not precluded, the amount of the award is reviewed based on the manifest weight of the evidence. See *Wildman, Harrold, Allen, & Dixon v. Gaylord*, 317 Ill. App. 3d 590, 598 (2000) (in determining the reasonableness of attorney fees after a bench trial, the sole question on review is whether the trial court's judgment for attorney fees and costs was against the manifest weight of the evidence).

¶ 68    Based on a *de novo* review of the attorney-client agreement, we find that, on its face, the agreement contains no provision that is contrary to public policy. It was entered into jointly by all parties. Defendants do not argue that the contingency fee structure set forth in the attorney-client agreement is excessive or the fee or type of representation is prohibited by law. If this were the case, recovery under a theory

- 19 -

of *quantum meruit* would be barred altogether, and there would be no reason to consider any evidence of the value of the services rendered. See, *e.g.*, *First National Bank of Springfield*, 179 Ill. 2d at 359-64 (contract providing contingency fee to expert witnesses was void as against public policy, and thus payment for work performed in furtherance thereof is prohibited in *quantum meruit*).

¶ 69    While the appellate court found no illegal term or subject on the face of the attorney-client agreement, it held that the absence of a concurrent fee-splitting agreement between plaintiffs, with simultaneous written disclosure by plaintiffs of the terms of that agreement to defendants and their assent thereto, as required by Rule 1.5(e) (Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010)), rendered the attorney-client agreement void as against public policy.[5] See 2023 IL App (1st) 211638 ¶ 44. In order to review the appellate court's decision to render the attorney-client agreement void *ab initio* because there was no fee-splitting agreement that complied with Rule 1.5(e), we turn to the language and history of the rule.

¶ 70                          3. Rule 1.5(e) of the Rules of
                             Professional Conduct (2010)

¶ 71    This court extensively discussed Rule 1.5(e) in *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297:

    "Rule 1.5(e) is one of five subsections of Rule 1.5, the portion of the Rules of Professional Conduct governing fees attorneys may charge their clients. [Citation.] Subsection (a) of Rule 1.5 requires fees and expenses to be reasonable and sets out the factors to be considered in determining the

---

[5]We reject defendants' characterization of the attorney-client agreement itself as a fee-splitting agreement. The fact that both plaintiffs and their respective firms are named as "attorneys" in the agreement may give rise to an inference that they will divide the fee, but the attorney-client agreement serves a separate purpose, which is to set forth the terms of the attorney-client relationship. As explained further below, while there are requirements for agreements to divide fees between lawyers of different firms, there is no requirement that such agreements be set forth in an attorney-client agreement between the attorneys and the client. To hold otherwise would penalize plaintiffs for disclosing their joint representation to the clients in the attorney-client agreement, because in cases where the joint representation is not disclosed but is carried out in secret, courts have invalidated the fee-splitting agreement but not the underlying attorney-client agreement. See, *e.g.*, *Bennett v. GlaxoSmithKline LLC*, 2020 IL App (5th) 180281, ¶ 77 (because fee sharing agreement violated Rule 1.5, all fees reverted to attorney named in attorney-client agreement).

reasonableness of a fee. [Citation.] Subsection (b) addresses the obligation of attorneys to communicate to their clients the scope of the representation, the basis or rate of the fee and expenses for which the client is responsible, and any subsequent changes in the basis or rate of the fees and expenses. [Citation.] Subsection (c) authorizes contingent fees, except in certain circumstances, and lays out the procedures that must be followed when an attorney charges a client on a contingent fee basis. [Citation.] Subsection (d)(2) specifies when contingent fees are not permitted. [Citation.] Subsection (e), the provision at issue in this case, addresses the division of fees between lawyers who are not in the same firm. [Citation.]

The language of Rule 1.5(e) is simple and straightforward. It provides:

'(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer, or if the primary service performed by one lawyer is the referral of the client to another lawyer and each lawyer assumes joint financial responsibility for the representation;

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable.' " *Id.* ¶¶ 23-24 (quoting Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010)).

¶ 72    This court discussed the history and purpose of Rule 1.5(e) in *Esposito*:

"For much of its history, Illinois prohibited the sharing of fees between lawyers who were not in the same firm where the only service provided by one attorney was the referral of a client to the other. [Citation.] That changed when this court adopted the Illinois Code of Professional Responsibility (Ill. S. Ct. Code of Prof'l Resp. R. 1-101 *et seq.* (eff. July 1, 1980)) in 1980. [Citation.] Section 2-107 of the Code of Professional Responsibility removed the outright prohibition against fee sharing based solely on a client referral but made fee-sharing arrangements in such cases permissible only if they satisfied various safeguards designed to protect the client. [Citation.] ***

- 21 -

* * *

In 1990, this court repealed the Illinois Code of Professional Responsibility and adopted the Illinois Rules of Professional Conduct (Ill. R. Prof'l Conduct R. 1.5 (eff. Aug. 1, 1990)) in its place. The Rules of Professional Conduct combined fee-related issues into a single rule, as do the 2010 Rules under examination in this case. The new rule, designated as Rule 1.5, included successor provisions to Rule 2-107 of the Illinois Rules of Professional Conduct. As with Rule 2-107, Rule 1.5 permitted fee sharing between lawyers who are not in the same firm, but only under specified conditions.

***

As with Rule 2-107(a) of the Illinois Code of Professional Responsibility, Rule 1.5 of the Illinois Rules of Professional Conduct required written client consent to fee-sharing agreements. ***

When this court repealed the Illinois Rules of Professional Conduct in 2010 and replaced them with the Illinois Rules of Professional Conduct of 2010, which remain in effect today, it again continued to permit division of fees between lawyers who are not in the same firm provided that certain conditions are met. The applicable conditions, however, have been reduced to three. First, the division must be in proportion to the services each attorney actually rendered or, in cases where the primary service provided by one lawyer was the referral of the client to another lawyer, both lawyers must assume joint financial responsibility for the representation as a whole. [Citation.] Second, the client must agree in writing to the arrangement, including the share each attorney is to receive. [Citation.] Third, the total fee charged to the client must be 'reasonable' [citation], a determination governed by factors set out in subsection (a) of Rule 1.5 [citation]." *Id.* ¶¶ 26-32.

¶ 73    Noting that Rule 1.5's subdivisions constitute three separate conditions that must be satisfied in order for a fee-sharing agreement to be enforceable (*id.* ¶ 35), this court explained that "Rule 1.5 and its predecessor provisions have required disclosure of fee-sharing arrangements in order to preserve a client's right to be represented by an attorney of his or her choosing" (*id.* ¶ 38). Here, defendants admit they were aware that plaintiffs would jointly represent them and that both would be

- 22 -

fully responsible for their case. In fact, both plaintiffs and their respective firms were named in the attorney-client agreement. Importantly, while the existence of a fee-splitting agreement, including how the fees were to be divided, is required to be disclosed to and assented by the client in writing, nothing in Rule 1.5(e) requires that these provisions be included in the attorney-client agreement itself. In addition, while Rule 1.5(e) indicates that failure to abide by these requirements renders a fee-splitting agreement unenforceable, it does not indicate that any related attorney-client agreement is likewise unenforceable. Thus, the attorney-client agreement is valid on its face. For these reasons, plaintiffs' failure to enter into a fee-splitting agreement in compliance with Rule 1.5(e) does not render the attorney-client agreement void *ab initio* as violative of public policy but, rather, renders the agreement unenforceable, making *quantum meruit* recovery a matter of the circuit court's discretion. See *Much Shelist Freed Denenberg & Ament, P.C.*, 297 Ill. App. 3d at 381. As such, the appellate court's stated reason for reversing the *quantum meruit* award is incorrect.[6]

¶ 74    We recognize there are appellate decisions, as well as the California decision cited by the appellate court, that have held that a violation of Rule 1.5(e) renders the offending fee-division agreement void as against public policy, foreclosing an attorney's ability to recover, at law or in equity, under that agreement. See *Donald W. Fohrman & Associates, Ltd.*, 2014 IL App (1st) 123351; see also *Bennett v. GlaxoSmithKline LLC*, 2020 IL App (5th) 180281; *Chambers*, 56 P.2d 645. Our decision in this case does not disturb this precedent, as the plaintiffs are not seeking to enforce a contract between themselves and did not seek to have the circuit court divide the money judgment it entered jointly in plaintiffs' favor. Nor does this court condone any violation of the Rules of Professional Conduct, which attorneys must follow or face disciplinary action and risk forfeiture of related attorney fees, where the equities require such forfeiture in the discretion of the circuit court. See *Anderson v. Anchor Organization for Health Maintenance*, 274 Ill. App. 3d 1001,

---

[6]As previously mentioned, the appellate court found that the plaintiffs could recover in *quantum meruit* because defendants did not argue they were barred from such recovery. 2023 IL App (1st) 211638, ¶ 39. However, it reversed the amount of the award on the basis that the attorney-client agreement is void as against public policy. *Id.* ¶ 44 However, if the attorney-client agreement were void as against public policy, plaintiffs would be barred from any *quantum meruit* recovery. See, *e.g.*, *Leoris*, 150 Ill. App. 3d at 353.

1007 (1995). We simply conclude that the attorney-client agreement at issue, on its face, does not violate public policy, and the appellate court erred in so holding.

¶ 75 Because the attorney-client agreement was not void *ab initio*, the standard of review as to the amount of the award is deferential to the circuit court's judgment and is not to be disturbed unless it is against the manifest weight of the evidence. See *Wildman, Harrold, Allen & Dixon*, 317 Ill. App. 3d at 598. Thus, whether this court would have awarded an amount in line with the contingency fee structure in the attorney-client agreement is of no import if, based on the record before it, the circuit court could have reasonably made the award. We find the record supports the value determination based on the testimony of the parties as well as the expert testimony. Thus, we affirm the circuit court's determination as to the amount of the award.

¶ 76                                    CONCLUSION

¶ 77 For the foregoing reasons, we find that, under the circumstances presented, plaintiffs' failure to memorialize a fee division agreement between them and to obtain defendants' written consent thereto, as required by Rule 1.5(e) of the Rules of Professional Conduct (Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010)), does not preclude plaintiffs from recovering the reasonable value of their services from defendants in *quantum meruit*. In addition, we find that, based on the evidence presented, the amount of the award is not against the manifest weight of the evidence. Accordingly, we affirm that part of the appellate court judgment that found plaintiffs were entitled to recover from defendants in *quantum meruit* but reverse that part of the appellate judgment that reversed the amount of the award and remanded for a recalculation thereof. For the same reasons, we deny the relief defendants request in their cross-appeal and affirm the judgment of the circuit court.

¶ 78 Appellate court judgment affirmed in part and reversed in part.

¶ 79 Circuit court judgment affirmed.